UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| PAUL F. CADE | ) |
| Plaintiff, | ) |
| v. | ) No. 1:12 CV 110 DDN |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Paul F. Cade for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Paul F. Cade, born December 11, 1966, filed an application for Title XVI benefits on December 29, 2008. (Tr. 136.) He alleged an onset date of disability of December 29, 2008, due to a herniated disc, osteoporosis, and an ulcer. (Tr. 141.) Plaintiff's application was denied initially on April 7, 2009, and he requested a hearing before an ALJ. (Tr. 60-64, 69-70.)

On November 30, 2010, following a hearing, the ALJ found plaintiff not disabled. (Tr. 9-17.) On May 16, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On April 9, 2008, plaintiff arrived at the emergency room of Twin Rivers Regional Medical Center. He complained of low back pain that began the prior day after his

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The Court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

attempts to remove siding from a house.  During this visit, Amy Lockhert, M.D., administered Toradol, Norflex, and Depo-medrol to plaintiff.[2]  Results from the x-ray of plaintiff's lumbosacral spine revealed mild lateral scoliosis with convexity to the left, and fairly diffuse degenerative disc disease, especially about the L4-5 and L5-S1 interspaces.[3]  Dr. Lockhert diagnosed plaintiff with acute myofascial strain of the lumbar spine and chronic low back pain.[4]  Dr. Lockhert prescribed Motrin, Lorcet, and Flexeril, and further recommended ice, heat, and rest.[5]  Plaintiff was instructed to follow up with David Diffine, M.D., of Doctor's Inn Clinic.  (Tr. 225-35.)

On April 16, 2008, plaintiff again complained of low back pain.  Dr. Lockhert administered Vicodin, Rocephin, and Solumedrol to plaintiff during his visit.[6]  Dr. Lockhert diagnosed low back pain and prescribed Vicoprofen and Doxycycline.[7]  Plaintiff was again instructed to follow up with Dr. Diffine.  (Tr. 223-24, 252-59.)

---

[2] Toradol is used for the short-term treatment of moderate to severe pain.  WebMD, http://www.webmd.com/drugs.  Norflex is used to treat muscle spasms and pain.  It is usually used along with rest, physical therapy, and other treatment.  Id.  Depo-medrol is an epidural injection steroid, consisting of a corticosteroid and a local anesthetic pain relief medicine.  Id.

[3] The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the low back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 2117-18 (28th ed., Lippincott Williams and Wilkins 2006) ("Stedman").  Degenerative disc disease describes the normal changes that occur in spinal discs.  WebMD, http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview.

[4] Myofascial is defined as being of, or relating to the fascia surrounding and separating muscle tissue.  Stedman at 1272.

[5] Lorcet is used to relieve moderate to severe pain.  WebMD, http://www.webmd.com/drugs.  Flexeril is used short-term to treat muscle spasms.  Id.

[6] Vicodin is used to relieve moderate to severe pain.  WebMD, http://www.webmd.com/drugs.  Rocephin is an antibiotic used to treat a wide variety of bacterial infections.  Id.  Solumedrol is used to treat conditions such as arthritis, blood disorders, severe allergic reactions, certain cancers, eye conditions, skin/kidney/intestinal/lung diseases, and immune system disorders.  Id.

[7] Vicoprofen is used for a short time to help relieve moderate to severe pain.  WebMD, http://www.webmd.com/drugs.  Doxycycline is used to treat a wide variety of bacterial infections.  Id.

On April 24, 2008, plaintiff received an initial evaluation regarding his back pain from Dr. Diffine. Dr. Diffine diagnosed lumbar strain and gastritis and requested plaintiff's emergency room records.[8] (Tr. 219-21.)

On May 30, 2008, plaintiff again saw Dr. Diffine. Plaintiff complained of coughing, fever, sinus infection, back pain, numbness in his right leg, and pain in his left leg. Physical examination revealed abnormal gait, right leg limp, and lumbar pain. Dr. Diffine diagnosed plaintiff with leg and back pain, bronchitis, and sinusitis. Dr. Diffine noted that plaintiff was unable to get an MRI. Dr. Diffine refilled medications and recommended continued use of moist heat and ice. (Tr. 216-18.)

On June 27, 2008, plaintiff complained of back and right knee pain. Dr. Diffine found that knee pain caused his right leg limp and that attempts to exercise his full lumbar range of motion caused pain. Dr. Diffine diagnosed back pain, knee pain, and gastroesophageal reflux disease (GERD). Dr. Diffine refilled plaintiff's medications, instructed plaintiff to continue using heat and ice, and noted that plaintiff was unable to get an MRI or physical therapy due to his lack of financial resources and Medicaid's refusal to pay. (Tr. 214-16.)

On July 23, 2008, plaintiff complained of back pain, left knee pain, and stress and stated that domestic issues caused him stress and increased his pain. Dr. Diffine noted plaintiff's abnormal gait, limping with left leg and knee, and continued lumbar pain. Dr. Diffine diagnosed back pain, knee pain, and GERD. Dr. Diffine refilled plaintiff's medications and continued his attempts to obtain an MRI. (Tr. 212-14.)

On August 22, 2008, plaintiff complained of low back pain and difficulty sleeping. Dr. Diffine found right leg limp and decreased range of motion in the lumbar region. Dr. Diffine diagnosed lumbar pain, knee pain, and GERD. Dr. Diffine refilled plaintiff's medications and sent plaintiff to get lumbar and thoracic x-rays. (Tr. 210-12.)

On August 22, 2008, plaintiff's lumbar x-ray revealed mild levoscoliosis and degenerative disc disease, particularly in the low lumbosacral spine around the L4-5 and L5-S1 interspaces.[9] The lumbar x-ray also suggested a right-sided pseudarthrosis.[10] The

---

[8] Gastritis is inflammation, especially mucosal, of the stomach. Stedman at 790.

[9] Levoscoliosis is scoliosis, toward or on the left side. Stedman at 1078.

[10] Pseudarthrosis is a new, false joint arising at the site of an ununited fracture. Stedman at 1587.

results of plaintiff's thoracic x-ray revealed very minimal lateral scoliosis and fairly widespread but mild degenerative disc disease. (Tr. 238-39.)

On September 7, 2008, plaintiff returned to the emergency room due to pain in his neck and back radiating into his left leg. Plaintiff stated that his back "gave out" on him and his normal medications were not helping his pain. Plaintiff received Norflex and morphine during the visit. Upon discharge, plaintiff was diagnosed with back pain and instructed to follow up with Dr. Diffine. (Tr. 240-51.)

On September 22, 2008, plaintiff complained of pain and stiffness in his back, knees, and hips and stated that rainy weather conditions caused increased stiffness. Dr. Diffine found limping due to knee pain and decreased range of motion in plaintiff's knees and hips. He reviewed the x-rays with plaintiff and diagnosed levoscoliosis and spinal degenerative joint disease. He also refilled plaintiff's medications and noted plaintiff's use of Claritin D.[11] (Tr. 207-09.)

On October 22, 2008, plaintiff complained of increased pain and tingling in his right leg, pain in his back, and difficulty recovering from a squatting or sitting position. Dr. Diffine found a limping gait due to left leg and knee pain and decreased range of motion of the lower back, right hip, and leg. Dr. Diffine diagnosed lumbar radiculopathy, hip pain, and lumbar pain.[12] Dr. Diffine refilled plaintiff's medications, prescribed Celebrex for plaintiff's degenerative joint disease, and continued his attempts to obtain an MRI.[13] (Tr. 205-07.)

On October 27, 2008, plaintiff received an MRI of his lumbar spine at Twin Rivers Regional Medical Center. The MRI indicated endplate edema at L4-5 and L5-S1, desiccation of the disc at L4-5 and L5-S1, disc herniation to the left at L4-5, and disc herniation to the right at L5-S1.[14] (Tr. 237, 263.)

On November 20, 2008, plaintiff complained of increased back pain due to the cold weather. Dr. Diffine found limping gait due to a previous injury to plaintiff's leg and

---

[11] Claritin D is an antihistamine which provides relief of seasonal allergy symptoms. WebMD, http://www.webmd.com/drugs.

[12] Radiculopathy is a disorder of the spinal nerve roots. Stedman at 1622.

[13] Celebrex is a nonsteroidal anti-inflammatory drug, specifically a COX-2 inhibitor, which relieves pain and swelling. WebMD, http://www.webmd.com/drugs.

[14] Edema is an accumulation of an excessive amount of watery fluid in cells or intercellular tissues. Stedman at 612. Desiccation is the process of being dried thoroughly or rendered free from moisture. Stedman at 522.

decreased lumbar range of motion.  Dr. Diffine diagnosed herniated disc in his lumbar spine and back pain.  Dr. Diffine refilled plaintiff's medications and discussed a neurosurgery appointment with plaintiff. (Tr. 203-05.)

On December 8, 2008, plaintiff was examined by Dr. Diffine.  During this visit, plaintiff complained of sinus drainage, dizzy spells, increased reflux, increased fatigue, and increased back pain due to the cold weather.  After examining plaintiff, Dr. Diffine noted plaintiff's limping walk due to low back pain and decreased range of motion in the lumbar region.  Dr. Diffine diagnosed bulging disc in his lumbar spine and rhinitis.  Dr. Diffine refilled plaintiff's medications, and sent plaintiff to the hospital for lab work and a chest x-ray.  He also noted the need for a referral to address plaintiff's reflux disease. (Tr. 201-03.)

On December 8, 2008, plaintiff received a chest x-ray at Twin Rivers Regional Medical Center.  The x-ray showed no evidence of acute cardiopulmonary process. (Tr. 236.)

On December 17, 2008, plaintiff received a neurological examination from Sonjay Fonn, D.O.  In addition to performing a physical examination of plaintiff, Dr. Fonn reviewed his MRI.  Plaintiff complained of back pain radiating into his legs, primarily on the right side down to his toes.  Plaintiff further complained of "pins and needle sensation" and weakness in his legs.  Dr. Fonn noted that plaintiff smoked heavily and had previously benefitted from physical therapy.  His then-current medications included Celebrex, Zantac, hydrocodone, and Soma.[15]  Dr. Fonn diagnosed plaintiff with degenerative disc disease, discogenic pain, and lumbar radiculopathy secondary to degenerative disc disease at the L4-5 and L5-S1 level.[16]  He recommended physical therapy and informed plaintiff that with regard to future surgery, smoking presented a major concern. (Tr. 261-62.)

On January 20, 2009, plaintiff complained of back pain and mentioned that he would receive a neurological evaluation for a disability determination at his caseworker's instruction.  Examination revealed limping on the left due to old trauma and painful, decreased lumbar range of motion.  Dr. Diffine diagnosed lumbar radiculopathy and anxiety and noted plaintiff's inability to attend physical therapy due to a lack of Medicaid

---

[15] Zantac is an H2 histamine blocker.  It works by reducing the amount of acid in the stomach and is used to prevent and treat heartburn and other symptoms caused by too much acid in the stomach.  WebMD, http://www.webmd.com/drugs.  Soma is used short-term to treat muscle pain and discomfort. Id.

[16] Discogenic denotes a disorder originating in or from an intervertebral disc.  Stedman at 550.

- 5 -

coverage. Dr. Diffine further noted plaintiff's uncertainty about future care due to his belief that he would soon lose Medicaid coverage. (Tr. 267-69.)

On February 18, 2009, plaintiff complained of back pain. Dr. Diffine found a limping gait and painful lumbar range of motion. He diagnosed lumbar degenerative joint disease, joint pain, chronic obstructive pulmonary disease, and anxiety.[17] Dr. Diffine refilled plaintiff's medications. (Tr. 297-99.)

On March 19, 2009, Patrick Lecorps, M.D., examined plaintiff at the request of the Department of Family Services. Plaintiff complained of low back pain. Dr. Lecorps noted that plaintiff experienced some stiffness and could not touch his toes by bending at the waist. Dr. Lecorps reviewed plaintiff's x-rays and found degenerative disc disease at the L4-L5 level. Dr. Lecorps noted the absence of pain radiation to the lower limbs. Dr. Lecorps diagnosed plaintiff with lumbar spine arthritis. (Tr. 271.)

On March 26, 2009, plaintiff complained of back pain and allergies. Dr. Diffine diagnosed plaintiff with rhinitis, lumbar myelopathy, GERD, and gastritis.[18] Dr. Diffine refilled plaintiff's medications and referred plaintiff to another physician for an esophagogastroduodenoscopy.[19] (Tr. 299-301.)

On April 7, 2009, Amy Swain submitted a Physical Residual Functional Capacity Assessment form regarding plaintiff. Plaintiff reported an ulcer and back pain that radiated into both legs and his right toes. No medical records supported his claim of an ulcer. She noted that plaintiff suffered from degenerative disc disease at L4-L5 and L5-S1 level with disc herniation on the left at the L4-L5 level and on the right at the L5-S1 level, but further noted plaintiff had full strength, normal gait and station, and his sensation was intact. She found the following exertional limitations: he could occasionally lift and carry ten pounds, could frequently lift and carry less than ten pounds, could stand and walk at least two hours in an eight-hour workday, and could sit with normal breaks for a total of about six hours in an eight-hour workday. With regard to his postural limitations, she found that he could frequently balance, kneel, crawl, and climb ramps, stairs, ladders, ropes, and

---

[17] Chronic obstructive pulmonary disease (COPD) is a long-term lung disease that refers to both chronic bronchitis and emphysema. WebMD, http://www.webmd.com/lung/copd/default.htm.

[18] Myelopathy is a disorder of the spinal cord, or a disease of the myelopoietic tissues. Stedman at 1270.

[19] An esophagogastroduodenoscopy (EGD) is an endoscopic examination of the esophagus, stomach, and duodenum usually performed using a fiberoptic instrument. Stedman at 671.

scaffolds. She further found that he could occasionally stoop and crouch. She determined that he suffered from no manipulative, visual, communicative, or environmental limitations. She noted that he was able to bend, walk two blocks to the post office and back daily, shop weekly, do light household cleaning, laundry, and occasionally cook. He quit his employment for reasons other than physical impairments. She concluded that his statements were only partially credible. She found that he was able to adjust to other sedentary work, such as surveillance system monitor, call-out operator, and weight tester and that the number of jobs in this range would not be significantly reduced by his nonexertional restrictions. (Tr. 51-58.)

On April 27, 2009, plaintiff complained of back pain, increased stress, and allergies. Dr. Diffine found a limping gait due to pain in his hips and lumbar spine. Dr. Diffine diagnosed COPD, lumbar myelopathy, joint pain, and rhinitis. Dr. Diffine refilled plaintiff's medications and changed his allergy medication to Zyrtec D.[20] (Tr. 301-303.)

On June 3, 2009, plaintiff complained of increased pain in his lower back and legs, depression, and anger. He informed Dr. Diffine that he exhausted his supply of medication several days prior to the visit. Dr. Diffine's examination revealed abnormal gait due to pain in plaintiff's legs and hips, as well as increased pain in his lower back with some mild spasms. He diagnosed lumbar myelopathy, leg pain, depression, and rhinitis and refilled plaintiff's medications. (Tr. 303-05.)

On June 5, 2009, plaintiff tested positive for amphetamine, methamphetamine, and cannabinoid. Upon receipt of the results of the positive tests from LabCorp, Dr. Diffine notified plaintiff that he would no longer serve as his physician. (Tr. 306-07.)

On September 7, 2010, Barry Burchett, M.D., performed an internal medicine examination for plaintiff's disability determination. Plaintiff complained of neck and low back pain that continuously sitting or standing for longer than thirty minutes exacerbated, intermittent left thigh paresthesias, and occasional left leg cramps. He complained of occasional numbness in the left forearm and fingers. He also mentioned that use of a back brace alleviated his pain slightly. He reported smoking a pack of cigarettes per day and alcohol consumption during weekends. Dr. Burchett diagnosed plaintiff with chronic low back pain, chronic cervicalgia, emphysema, and GERD. Dr. Burchett further noted that there was a fairly significant limitation of voluntary lumbar flexion. (Tr. 309-15).

Dr. Burchett also submitted a Medical Source Statement of Ability to Do Work–Related Activities (Physical) regarding plaintiff. He found that plaintiff could frequently lift

---

[20] Zyrtec D. is used to relieve allergy symptoms. WebMD, http://www.webmd.com/drugs.

and carry up to 10 pounds, could occasionally lift and carry between 11 and 20 pounds, but could never lift or carry more than 20 pounds. Additionally, he opined that plaintiff could sit, stand, and walk continuously for only one hour at a time. Dr. Burchett stated that over the course of an eight hour day, plaintiff could sit for a total of five hours and could stand and walk for a total of two hours each. Dr. Burchett noted that plaintiff did not require the use of a cane to ambulate. (Tr. 316-17.)

Dr. Burchett reported that plaintiff could never reach overhead with either hand, but could frequently reach in all other directions, could occasionally handle, push, and pull items, and could continuously finger and feel objects. He further reported that plaintiff could occasionally operate foot controls with both feet. He concluded that plaintiff could occasionally crawl and climb stairs and ramps, could frequently balance, but could never climb ladders or scaffolds, stoop, kneel, or crouch. He noted that plaintiff could never tolerate exposure to dust, odors, fumes, and pulmonary irritants and could occasionally tolerate operating a motor vehicle, extreme cold and heat. Finally, he found that the aforementioned limitations had lasted or would last for 12 consecutive months. (Tr. 318-21.)

On September 24, 2010, Paul Rexroat, Ph.D., examined plaintiff and submitted a Medical Source Statement of Ability to Do Work-Related Activities (Mental). Plaintiff complained of depression, frequent mood swings, lack of energy and motivation, sadness, loneliness, low self-esteem, and sleeping problems. He walked slowly and rose and sat awkwardly as if in pain. He received overnight treatment at Pemiscot Memorial Hospital's Resolutions Treatment Center due to having suicidal thoughts a week prior to the evaluation. He dropped out of high school in the twelfth grade. He previously worked as a construction laborer, welder, plumber and mechanic, but never held a job longer than a year. He used marijuana from the time he was sixteen years old until five years before the examination. He was a heavy drinker twenty years ago, but now seldom drinks. He was in Twin Rivers Regional Medical Center's First Step Program in 1994 and twice in 1995. He used methamphetamine intermittently for six years until December 2009 when he was convicted of attempt to manufacture methamphetamine. He completed a 120-day drug rehabilitation program at Cramer Rehabilitation Center and is currently on parole. At the time of the visit, his medications included Zoloft, Thorazine, and Trazodone.[21] Dr. Rexroat

---

[21] Zoloft is used to treat depression, panic attacks, obsessive compulsive disorder, post-traumatic stress disorder, social anxiety disorder (social phobia), and a severe form of premenstrual syndrome. WebMD, http://www.webmd.com/drugs. Thorazine is used to treat certain mental/mood disorders such as schizophrenia, psychotic disorders, manic

found that he could understand and remember simple instructions, could sustain concentration and persistence with simple tasks, and could interact socially and adapt to his environment. Dr. Rexroat diagnosed recurrent, moderate major depression and methamphetamine dependence in remission since December 2009. Dr. Rexroat gave a GAF score of 50.[22]  (Tr. 327-30)

Dr. Rexroat concluded that plaintiff suffered from minor impairment of the ability to make judgments on simple work-related decisions and from moderate impairment of the ability to understand, remember, and carry out complex instructions and to make judgments on complex work-related decisions. Dr. Rexroat also found moderate impairment of his ability to interact appropriately with the public, with supervisors, and with co-workers, as well as his ability to respond appropriately to usual work situations and to changes in a routine work setting. Dr. Rexroat noted that he appeared to be of average intelligence and his major depressive disorder caused the aforementioned limitations. Specifically, Dr. Rexroat found that he should not be allowed to manage his own funds because of the danger he would spend his money on methamphetamines. (Tr. 324-30.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on July 29, 2010. (Tr. 21-49.) Plaintiff testified to the following. He is 43 years old and lives with his mother. His son's friend transported him to the hearing. The trip lasted for about seventy-five minutes, and midway through the trip, he needed a break to stretch. He completed the eleventh grade and eventually attained a GED. About ten years ago, driving while intoxicated resulted in the

---

phase of bipolar disorder, and severe behavioral problems in children. Id. Trazodone is used to treat depression. Id.

[22] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
  A GAF score from 41-50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed.2000).

revocation of his driver's license, and he continued to drive following the revocation, which resulted in the suspension of his license. He has not reinstated his license. (Tr. 25-26.)

Plaintiff last worked for about a month and a half in 2008 as a welder for American Railroad in Perryville, Arkansas and received training from his employer. He previously worked as a mechanic on gasoline engines for FMT Transport for roughly four of five months until he went to work for American Railroad. (Tr. 26-28.)

Prior to his time with FMT Transport, plaintiff worked for Bill Stone and also performed construction work from 2000 to 2007 in Canada. Specifically, he performed carpentry work such as framing houses, concrete work, and finishing work. A relationship motivated his move to Canada, but he faced deportation due to overstaying his allowed time of six months. (Tr. 28-29.)

Between 1995 and 1999, plaintiff worked for American Railroad as a welder, for Bill Stone as a construction worker, and for Johnson's House Movers as a mover. (Tr. 30.)

On December 29, 2008, plaintiff quit his employment with American Railroad due to increased severity of his back problems. He did not seek less physically demanding work. He believes his employment options are limited by his inexperience in areas other than construction. (Tr. 30.)

At the time plaintiff quit his employment, he received treatment from Dr. Diffine. Services rendered by Dr. Diffine included MRIs, physical therapy referrals, and pain medication prescriptions. The pain medications alleviated his pain, and he took them at work. Plaintiff never attended physical therapy due to his insurance company's refusal to pay. Plaintiff never received instruction to perform home exercises. (Tr. 31.)

The ALJ observed that plaintiff wore a back brace. Plaintiff did not receive the back brace under medical instruction but obtained it on his own accord. (Tr. 31-32.)

Plaintiff has not received medical attention for some time due to the loss of medical insurance. He originally obtained Medicaid coverage through the Division of Family Services but lost coverage after his son's marriage in the summer of 2009. He never reapplied. He attended hearings regarding his coverage and explained his medical issues but was not permitted to continue his Medicaid coverage. (32-34.)

During a typical day, plaintiff awakens at 7:30 a.m. and stays around his home unless he finds a reason to go to town, which is two and a half blocks away. He performs yard work, shops, checks the mail, reads, and takes short walks. He occasionally visits friends who live nearby. He does not have a car or a license and cannot travel to seek

employment. Plaintiff applies for food stamps in Kennett, Missouri and is driven there by others. He enjoys watching car races. (Tr. 26, 34-36, 38.)

The most he can lift is between five and ten pounds. He can sit or stand only for about 30 minutes at a time. He takes over-the-counter medications such as Alleve, Tylenol, BC powders, Zyrtec, and Zantac. Occasionally, plaintiff uses a cane. He receives financial assistance from his mother and brother. When Medicaid covered plaintiff, he attempted to arrange surgery. Dr. Fonn informed him that surgery was a possibility but that it would not alleviate his pain. (Tr. 36-38.)

Plaintiff served in the Army Reserve, Air National Guard from 1983 until 1993. He received payment in cash for his work as a mechanic and some of his construction work. He exercises as much as possible, even on his bad days. He walks to the store or post office nearly every day. While mowing the yard, he takes breaks to sit and rest every five to ten minutes. Once or twice a week, plaintiff has to lie down in 30 to 60 minute intervals. During these intervals, he props up his feet and lies on his side with a pillow between his legs to further alleviate his pain. He has difficulty sleeping at night due to his inability to find a comfortable resting position due to the pain in his lower back and his shoulders. (Tr. 39-41.)

Plaintiff's back pain radiates into his left leg most of the time and radiates into his right leg sometimes. His ability to grip with his right hand is affected by his missing part of a finger on his right hand. He suffers from depression, which was helped by Zoloft, which he took when he was covered by Medicaid. On his walks to town, he takes a path through a park with benches, which he uses for rest when necessary. (Tr. 41-43.)

Plaintiff experiences particularly bad days about once a week. On these days, plaintiff can do very little and spends the vast majority of his time on the couch with his feet propped up. (Tr. 43-44.)

Vocational expert (VE) Susan Shay also testified at the hearing. The VE testified that plaintiff worked as a welder, which is heavy, semi-skilled work; as a mechanic, which is medium, semi-skilled work; as a construction worker, which is heavy, semi-skilled work;, and as a surveying worker or helper, which is medium, semi-skilled work. None of the skills used in his past work transferred to less physically demanding work. (Tr. 45.)

The ALJ presented a hypothetical question concerning an individual with plaintiff's age, education, training, and work experience. The individual could occasionally lift ten pounds, could stand and walk only two hours in an eight-hour workday, and could sit at least six hours. The individual should not operate foot controls with the left leg and should

avoid climbing ladders, ropes and scaffolds. The individual could only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. The individual might have some slight reduction in grip strength and some fingering limitations due to missing part of his right ring finger. The individual should avoid concentrated exposure to vibration and should not work at unprotected heights or around unprotected dangerous machinery.

The VE responded that such individual could not perform any of plaintiff's past work, but could work at a machine tending job, which is sedentary work with 5,400 positions in Missouri. The hypothetical individual could also perform table working jobs, which is work with 9,000 positions in Missouri. The individual could also perform hand assembly jobs, though the individual's limitations would slightly reduce the number of qualified positions in Missouri to 4,000. (Tr. 45-47.)

The ALJ altered the hypothetical individual by adding the need to consistently miss more than two days per month. The VE responded that this would preclude competitive employment in the aforementioned jobs. (Tr. 47.)

The ALJ again altered the hypothetical individual with the requirement that the individual could show up every day, but at least once a week would have to show up late to work or leave work early or step away from the work setting for the equivalent of an additional break, which would occur randomly. The VE responded that such individual would be precluded from competitive employment. (Tr. 47-48.)

### III. DECISION OF THE ALJ

On November 30, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 9-17.) At Step One of the prescribed regulatory decision-making scheme,[23] the ALJ found that plaintiff had not engaged in substantial gainful activity since the application filing date, December 29, 2008. At Step Two, the ALJ found that plaintiff's severe impairments included degenerative disc disease of the lumbosacral spine, an old partial amputation of a right hand finger, and very recent onset of depression. (Tr. 16.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 16.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform at least sedentary work, except possibly for prolonged or frequent standing or walking; lifting or carrying objects weighing more than 10 pounds; climbing of

---

[23] See below for explanation.

ropes, ladders or scaffolds; more than occasionally climbing of ramps and stairs or stooping or kneeling; operating foot controls with the left lower extremity; or having concentrated or excessive exposure to unprotected heights, dangerous moving machinery, or vibrations. At Step Four, the ALJ found plaintiff unable to perform any past relevant work. (Tr. 16.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 16.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to

return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to his PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) failing to consider awarding plaintiff a closed period of disability, which was based on the ALJ misapplying the test for evaluating the credibility of plaintiff's subjective complaints; (2) failing to give controlling weight to the opinion of Dr. Burchett; and (3) failing to formulate a hypothetical question posed to the VE which mirrored the limitations of the plaintiff.

### A. Credibility

Plaintiff argues that the ALJ misapplied the test for evaluating the credibility of plaintiff's subjective complaints set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

To assess a claimant's credibility, the ALJ must look at (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; (5) functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d at 1322. The ALJ does not need to recite and discuss each of the Polaski factors when making a credibility determination. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). If an ALJ rejects the subjective complaints of the plaintiff, the ALJ must "make an express credibility determination explaining the reasons for discrediting the complaints." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Plaintiff testified that the most he can lift is between five and ten pounds and that he can sit or stand only for about 30 minutes at a time. (Tr. 36.) He testified that once a week he experiences particularly bad days where he can do very little and spends the vast majority of these days on the couch with his feet propped up. (Tr. 43-44.) He also testified that once or twice a week he has to lie down in 30 to 60 minute intervals, during which he props up his feet and lies on his side with a pillow between his legs to further alleviate his

pain. (Tr. 40.) He additionally testified that he has difficulty sleeping at night because he cannot find a comfortable resting position due to the pain in his lower back and his shoulders. (Tr. 40-41.)

The ALJ provided several reasons supporting his finding that plaintiff's alleged inability to perform any sustained work activity was not credible. (Tr. 10-15.) The ALJ must judge the credibility of the claimant's subjective complaints in light of observations by third parties, including physicians. Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). In discounting plaintiff's credibility, the ALJ noted that no treating physician ever stated or implied that he is disabled or totally incapacitated. (Tr. 13.) "That a physician did not "submit . . . a medical conclusion that [the claimant] is disabled and unable to perform any type of work" is a significant factor for the ALJ to consider." Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000).

The ALJ additionally discussed plaintiff's lack of self-initiated medical care after June of 2009. If there is no evidence of ongoing pursuit of care from accepted sources, an ALJ may properly discount a claimant's credibility based on a failure to pursue regular medical treatment. Edwards v. Barnhart, 314, F.3d 964, 967 (8th Cir. 2003); see Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 21997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits).

Plaintiff attributed his lack of medical care to the loss of Medicaid coverage in early 2009. (Tr. 32.) In some cases, a lack of financial resources may justify a claimant's failure to seek medical care. Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). However, a claimant must present "supporting evidence" that his failure to seek medical treatment was due to the expense. George v. Astrue, 301 F. App'x 581, 582 (8th Cir. 2008) (per curiam); see also Carrigan v. Astrue, No. 4:08 CV 4018, 2009 WL 734116, at *6-7 (W.D. Ark. Mar. 17, 2009) (claimant's "bare statement" that he is unable to afford medical treatment is insufficient to establish that inability.) Since plaintiff did not "identify any steps he took to obtain low cost medical care," and because "he did not testify that he was denied medical care because of his financial condition," the ALJ properly considered his lack of follow up medical treatment in discounting his credibility. Weaks v. Shalala, 1993 WL 498046, at *1, 12 F.3d 1104 (8th Cir. 1993) (unpublished table opinion); see also Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003); Carrigan, 2009 WL 734116, at *7. While he may have attempted to keep his Medicaid card, the record does not indicate that plaintiff attempted to

reapply for Medicaid coverage or was ever denied care due to lack of insurance or financial resources.

The ALJ noted several inconsistencies between plaintiff's claims and the medical records. (Tr. 11, 13.) For instance, he observed that while plaintiff was under Dr. Diffine's care, he seldom had any true abnormalities on examination other than a constant limp. (See e.g., Tr. 201-21, 267-69, 297-305.) Furthermore, the ALJ considered the MRI taken on November 20, 2008 and noted that it showed no evidence of any nerve root compression or impingement, acute injury, or typical neurological deficits. (Tr. 237, 263.) The ALJ additionally concluded that plaintiff does not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently recurring muscle spasms, obvious or consistently reproducible neurological deficits (motor, sensory, or reflex loss) or other signs of nerve root impingement, consistently positive straight leg raising, persistent inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction. (Tr. 14.) Though plaintiff occasionally uses a cane, the ALJ found that he requires no cane, crutches, or other assistive device to stand or walk. (Tr. 14.)

Plaintiff additionally directs the court's attention to the ALJ's determination that Dr. Fonn's report did not reflect a discussion of surgery. (Tr. 11.) While a reference to surgery is certainly present in Dr. Fonn's report (Tr. 262), the report does not support plaintiff's claim that without surgery or intensive physical therapy, or a combination of the two, that plaintiff will "assuredly" be unable to return to the workforce.

The ALJ's analysis reflects that he considered each of the relevant factors outlined in Polaski. The court finds substantial evidence to support the ALJ's credibility analysis. Accordingly, Plaintiff's argument is without merit.

**B. Weight of Physician's Opinion**

Plaintiff contends that Dr. Burchett's opinion is entitled to controlling weight. But the opinion of a consulting physician based upon a single examination generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Further, the ALJ may reject the conclusion of any medical expert if it is inconsistent with the record as a whole. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

The ALJ considered the opinion of Dr. Burchett. Dr. Burchett performed a one-time, independent evaluation of plaintiff and completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. 310-21.) The RFC Dr. Burchett assigned to plaintiff differed from that adopted by the ALJ in that Dr. Burchett opined that plaintiff

could never stoop, kneel, or crouch, rather than occasionally being able to do so. (Tr. 16, 316-21.)

The inconsistencies in the medical record observed by the ALJ set forth above sufficiently support the ALJ's deviation from Dr. Burchett's RFC determination. Furthermore, the specific restrictions Dr. Burchett placed on plaintiff are not corroborated by any other physician who has treated plaintiff. Therefore, the ALJ properly disregarded Dr. Burchett's opinion.

**C. Hypothetical Question**

Plaintiff argues that the ALJ erred by failing to formulate a hypothetical question to the VE that fully encompassed plaintiff's impairments. Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hillier v. Social Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007). Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the 'concrete consequences' of those impairments. Id.

In the ALJ's opinion, he relies on VE testimony given as a response to the ALJ's hypothetical question. (Tr. 12-13, 15-16.) The hypothetical question involved an individual with an RFC that the ALJ later found to be plaintiff's RFC. (Tr. 16, 45-46.) Specifically, plaintiff argues that because the ALJ did not incorporate each of Dr. Burchett's findings into the RFC determination, the hypothetical question encapsulating that determination failed to capture the concrete consequences of plaintiff's impairments. However, as discussed above, the ALJ properly disregarded Dr. Burchett's opinion. Therefore, the ALJ did not err by relying on the VE's response to a hypothetical question, and plaintiff's argument is without merit.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

                                         /S/   David D. Noce
                              **UNITED STATES MAGISTRATE JUDGE**

Signed on August 12, 2013.